**UNITED STATES DISTRICT COURT**
**IN THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| Babcock Center, Inc., | ) | |
| | ) | C/A No. 3:11-01721-CMC |
| Plaintiff, | ) | C/A No. 3:11-03155-CMC |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| United States of America, acting by and through its agency, the Internal Revenue Service, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| Babcock Center, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| United States of America, acting by and through its agency, the Internal Revenue Service, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on motion for summary judgment and partial motion to dismiss filed by Defendant, the United States of America, on November 30, 2012.[1] Dkt. No. 43. Plaintiff Babcock Center, Inc. ("Babcock Center") filed a response on January 4, 2013 (Dkt. No. 54), and a corrected response on January 8, 2013 (Dkt. No. 57). Defendant replied on January 18, 2013. Dkt. No. 61. For reasons stated below, Defendant's motion for summary judgment is granted in part and denied in part, and Defendant's motion to dismiss is denied.

---

[1] Babcock Center filed two separate actions, one for penalties assessed for 2007 and one for 2008. These cases were consolidated. All references to the docket are to the main case, 3:11-01721.

1

## FACTS

The material facts are not in dispute.  Babcock Center is a private, nonprofit organization, which serves people with mental retardation, autism, head and spinal cord injuries, and related lifelong disabilities.  Dkt. No. 57 at 2.  Babcock Center's mission is "to empower and support these mentally disabled or handicapped individuals to fulfill his or her full potential."  *Id.*  Babcock Center provides mentally disabled or handicapped individuals with room and board, and "the training and skills necessary for their personal success."  *Id.*  "[S]everal hundred disabled individuals rely on Babcock Center for essential services and fulfillment of their needs."  Dkt. No. 57 at 2.  Babcock Center is mostly funded by grants from the South Carolina Department of Disabilities and Special Needs ("SCDDSN").[2]  *Id.*

From 2004 to 2006, SCDDSN required that Babcock Center cut approximately 50% of its residential program, which resulted in the loss of 318 residential beds.  Babcock Center lost certain residential properties, which were returned to SCDDSN, and the funding associated with the bed reduction.[3]  *Id.* at 2.  Babcock Center reduced staff to the extent allowed by state regulations.  By early 2007, the reduction in size had been completed.  However, the reduction in funding, as well

---

[2]  Babcock Foundation is a 501(c)(3) corporation that supports Babcock Center.  It enables individuals to donate to Babcock Center, often supporting client needs that are not covered by Medicaid, such as clothing or equipment.  *See* Dkt. No. 43-2 at 22 (Tyler Dep. 18:1-10) ("If a consumer has to get eyeglasses and it's not time for them to get another pair under Medicaid rules, then the foundation would purchase it for them.").  The record does not contain any evidence of the assets of the Babcock Foundation.

[3]  Babcock Center maintains that it "lost all investments in those properties," which were returned to SCDDSN.  Babcock Center has provided no evidence as to why the return of these properties would have contributed to Babcock Center's cash flow issues, except as to the corresponding loss of funding to support clients that previously resided in these properties.

as a change in the timing of funding from SCDDSN,[4] caused significant cash flow issues in 2007 and 2008. *Id.* During that period, Babcock Center failed to deposit and pay payroll taxes for twenty-three pay periods.[5] During those two years, Babcock Center deducted funds from employee

---

[4] Babcock Center cites to the affidavit of Babcock Center's current Chief Financial Officer ("CFO") Charles Norman, as evidence of the change in the timing of funding. Dkt. No. 57 at 3 (citing Dkt No. 57-5 at 2 (Norman Aff. ¶ 7)). Mr. Norman's affidavit states, without explanation, that "during the time in question period, a change in the timing and amount of funding from government grants caused further cash flow problems up to One Million ($1,000,000) Dollars." Norman Aff. ¶ 7. It appears from deposition testimony of Mr. Norman and former CFO Linda Tyler that SCDDSN previously paid Babcock Center once a month at the beginning of the month and then changed to twice a month. Dkt. No. 43-2 at 222-32 (Norman Dep. 42:25-43:2) ("And then there's 2004 through 2006 where they changed from once a month prospectively to two weeks prospectively."); Tyler Dep. 72:1-13 ("And they changed the way they paid us. They used to pay us one month prospectively, and then they changed it to where we were going to get two payments with one payment right at the very beginning or right before the beginning of the month, another payment right at the middle, which made it a little more difficult because typically the payments that we were receiving from DDSN covered the payroll, at least the amount that we owed employees. So it made it harder because we didn't have that extra chunk right at the beginning of the month to try to pay some of our vendors."). Ms. Tyler stated that this change occurred in May or June of 2008. Tyler Dep. 102:2-21.

[5] Many of the unpaid payroll taxes were trust fund taxes. As explained by the Fourth Circuit:

The Internal Revenue Code requires employers to withhold social security and federal excise taxes from their employees' wages. *See* 26 U.S.C. §§ 3402(a), 3102(a) (2006); *Plett v. United States*, 185 F.3d 216, 218 (4th Cir. 1999). The employer holds these monies in trust for the United States. 26 U.S.C. § 7501(a) (2006). Accordingly, courts often refer to the withheld amounts as "trust fund taxes"; these monies exist for the exclusive use of the government, not the employer. *See Plett*, 185 F.3d at 218. Payment of these trust fund taxes is "no[t] excuse[d]" merely because "as a matter of sound business judgment, the money was paid to suppliers . . . in order to keep the corporation operating as a going concern—the government cannot be made an unwilling partner in a floundering business." *Collins v. United States*, 848 F.2d 740, 741–42 (6th Cir. 1988).

*Erwin v. United States*, 591 F.3d 313 (4th Cir. 2010) (describing trust fund taxes in a responsible person case, *i.e.*, where personal liability is imposed on certain officers or agents of the employer for nonpayment of a corporation's taxes).

paychecks but did not remit those funds to the IRS.[6]

The Internal Revenue Service ("IRS") assessed Babcock Center penalties as mandated by 26 U.S.C. §§ 6651(a)(2) and 6656(a). Babcock Center eventually paid the payroll taxes as well as the penalties, with the exception of the tax quarter ending December 31, 2008. Babcock Center filed this refund suit seeking a refund of penalties paid or an abatement of penalties for tax periods ending March 31, 2007; June 30, 2007; September 30, 2007; December 31, 2007; June 30, 2008; September 30, 2008; and December 31, 2008.[7] Babcock Center does not dispute that it failed to (1) make timely deposits toward its liabilities for federal payroll taxes and (2) timely pay those liabilities. Rather, Babcock Center asserts a statutory defense, arguing that Babcock Center is entitled to a refund of penalties because its failures were "due to reasonable cause and not due to willful neglect." 26 U.S.C. §§ 6651 (a)(2) and 6656(a). Babcock Center also seeks preliminary and permanent injunctive

---

[6] Babcock Center contends that it never retained the employees' portion of payroll taxes in the operating account:

> Babcock Center prepared its payroll on a "net" basis. The Center has two checking accounts – general operating and payroll. On the date of each "pay day", Babcock Center would generate payroll checks from the payroll account and a funds transfer would be made from the operating account to the payroll account to cover these checks. Accordingly, the payroll account was a "zero-based" account." When sufficient funds were available to pay the payroll taxes due as calculated, a deposit would be made from the operating account. (Exh. 4, Norman Aff., Para. 13.) Contrary to the Government's assertion, "trust fund portions" were not retained in the general operating account.

Dkt. No. 57 at 9-10. However, Babcock Center did not place the employees' portion in a separate account. Tyler Dep. 29:19-22 ("There was a separate payroll account for the checks to sweep through and the direct deposits to sweep through, but the payroll taxes came out of the operating, if I remember correctly.").

[7] Babcock Center was also assessed penalties for the tax quarters ending March 31, 2009 and September 30, 2009. After appealing to the IRS, Babcock Center received an abatement of $50,108.34 of the $62,635.42 penalty. *See* Dkt. No. 57-11.

relief against IRS collection efforts.  In the event all penalties are not refunded, Babcock Center seeks an order requiring the IRS to reallocate Babcock Center's tax payments in a way that will reduce penalties owed.  The United States, acting on behalf of the IRS, counterclaimed to reduce to judgment the unpaid balance of federal taxes, penalties, and interest for the tax period ending December 31, 2008.

The United States moved for summary judgment arguing Babcock Center is unable to prove that (1) it qualifies for the reasonable cause exception to the payment of penalties and (2) the IRS inappropriately allocated Babcock Center's tax payments to inflate the penalties owed.  The United States also argues that it is entitled to summary judgment on its counterclaim for taxes and penalties for the tax quarter ending December 31, 2008.  Babcock Center responds that genuine disputes of material fact exist, which preclude summary judgment on all grounds.

The United States moved to dismiss Babcock Center's claims for preliminary and permanent injunctive relief against IRS collection efforts, arguing that the Anti-Injunction Act prohibits such relief, particularly for tax periods not involved in this action.  The United States also moved to dismiss Babcock Center's claim for refund for the tax quarter ending December 31, 2007, arguing that Babcock Center did not first file a claim for refund with the IRS for this period as is required before bringing suit in district court.  Babcock Center responds that an exception to the Anti-Injunction Act applies and that, although it did not file a formal claim for refund for the fourth quarter of 2007, Babcock Center submitted an informal claim, which is sufficient to put the IRS on notice.  The United States did not address Babcock Center's arguments in opposition to dismissal in its reply.

5

## STANDARDS

**Summary Judgment.** Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Rule 56(c)(1) provides as follows:

(1)    A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

    (A)    citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers or other materials; or

    (b)    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment

6

motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

The non-moving party cannot create a genuine issue of material fact by presenting his or her own conflicting versions of events. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct."). This rule applies equally to the testimony of non-party witnesses presented by the non-moving party. *See Rohrbough v. Wyeth Laboratories, Inc.*, 916 F.2d 970, 974-77 (4th Cir. 1990) (affirming trial court's rejection of expert's affidavit testimony which contradicted his sworn deposition testimony).

**Motion to Dismiss.** A motion under Federal Rule of Civil Procedure 12(b)(6) should be granted only if, after accepting all well-pleaded allegations in the complaint as true, it appears certain that the plaintiff cannot prove any set of facts in support of its claims that entitles it to relief. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). Although the court must take the facts in the light most favorable to the plaintiff, it "need not accept the legal conclusions [the plaintiff would draw] from the facts." *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000)). The court may also disregard any "unwarranted inferences, unreasonable conclusions, or arguments." *Id.*

## DISCUSSION

### *Motion for Summary Judgment*

### I. Refund of Penalties.

Penalties shall be imposed if a taxpayer fails to deposit and pay taxes when due, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." 26 U.S.C. §§

7

6651(a)(2) and 6656(a).[8]  To succeed in an action for refund of penalties, Babcock Center must prove

by a preponderance of the evidence that its failures to deposit and pay payroll taxes were caused by

"reasonable cause and not due to willful neglect."  Babcock Center must prove both (1) the absence

of willful neglect and (2) the existence of reasonable cause.  *United States v. Boyle*, 469 U.S. 241,

245 (1985).  The United States Supreme Court has described the taxpayer's burden in proving

reasonable cause as a "heavy burden." *United States v. Boyle*, 469 U.S. 241, 245 (1985).  Further,

when a taxpayer fails to deposit trust fund taxes, the taxpayer "must provide strong justification to

avoid penalties." *Diamond Plating Co. v. United States*, 390 F.3d 1035, 1039 (7th Cir. 2004) ("We

also note that some of the delinquent taxes were trust fund taxes.  Rather than remitting these taxes

to the government on a quarterly basis after withholding them from employee wages, Diamond

Plating used the funds for operating expenses.").  "[I]t will be the rare case where the government

is made the 'unwilling partner in a floundering business,' . . . without the employer incurring the duty

to pay a penalty for having made such a choice." *Q.E.D., Inc. v. United States*, 55 Fed. Cl. 140, 146

(Fed. Cl. 2003) (quoting *Brewery*, 33 F.3d at 593).

    **A.  Absence of Willful Neglect.**  The United States Supreme Court has defined willful

neglect as "a conscious, intentional failure or reckless indifference." *Boyle*, 469 U.S. at 245.  In

other words, Babcock Center must prove that its failures were neither the result of "carelessness,

reckless indifference, nor intentional failure." *Id.* at 246 n. 4.

    There is evidence that, with the exception of the tax quarter ending December 31, 2008,

Babcock Center made a conscious decision not to deposit and pay certain payroll taxes in 2007 and

2008 based on financial difficulties, not as a result of carelessness or reckless indifference.  Former

CFO Linda Tyler was responsible for seeing that payroll tax deposits were made when Babcock

---

[8]  Neither "willful neglect" nor "reasonable cause" are defined in the Internal Revenue Code.

Center issued payroll checks, which was bimonthly. Ms. Tyler testified that she would decide each pay period whether Babcock Center was able to deposit its payroll taxes.[9] Tyler Dep. 31-33. The court, therefore, assumes for purposes of this motion that Babcock Center's failures to deposit and pay payroll taxes in 2007 and 2008 were not due to willful neglect, except in the last quarter of 2008 as described below.

The United States presents evidence that Babcock Center's failures to deposit and pay payroll taxes in the last quarter of 2008 were due to carelessness or reckless indifference. The United States identifies testimony explaining that the missed payments in the last quarter of 2008 were caused by confusion between management as to who was responsible for depositing and paying the payroll taxes. *See* Tyler Dep. 43:21-25 ("So in finance we thought the taxes [in the last tax quarter of 2008] were being paid when some of them were not, and I found out that they were not being paid right before I left."); Dkt. No. 43-2 at 246-47 (Tucker Dep. 27:23-28:2) (". . . there was like a disconnect during the time. I think at that point there was a time when L[i]nda Tyler assumed that I was handling the taxes, which that's where I think was the misconnect because I was under HR at that time and she was the finance director."). Babcock Center has failed to identify a genuine dispute of material fact as to the reason for missed deposits and payments in the last quarter of 2008.[10] For this

---

[9] Ms. Tyler testified that she would meet with the person who made the transfers of payroll taxes to the IRS every payday. They would talk "about how much money did we have, what could we pay, what could we not pay." Tyler Dep. 31:9-11. *See also id.* at 34:1-2 ("It was either keep the place running or pay the taxes.").

[10] Ms. Tyler avers by affidavit that she would review and analyze Babcock Center's cash position to determine whether to pay payroll taxes when due. Dkt. No. 57-6 at 2 (Tyler Aff. ¶ 5). She also avers that "[p]ayroll tax deposits that were made late during 2007 and 2008 were due to insufficient cash on hand to make these deposits timely and continue to pay for food, shelter, care and health and safety of the disabled individuals." *Id.* at ¶ 6. To the extent that Babcock Center attempts to use Ms. Tyler's affidavit to create a genuine issue of material fact as to the reason for the failures to deposit and pay in the tax quarter ending December 31, 2008, the court rejects such attempt and relies on Ms. Tyler's deposition testimony, which preceded her affidavit and is

reason, the court finds that Babcock Center's failures to deposit and pay payroll taxes in the last quarter of 2008 were due to willful neglect. Babcock Center is, therefore, not entitled to a refund or abatement of penalties for the tax quarter ending December 31, 2008. The United States' motion for summary judgment is granted for the tax quarter ending December 31, 2008.

**B. Reasonable Cause.**[11]    In addition to showing that Babcock Center's failures to deposit and pay payroll taxes were not due to willful neglect, Babcock Center also must show reasonable cause to obtain a refund of penalties. To demonstrate reasonable cause, Babcock Center must make "a satisfactory showing that [it] exercised ordinary business care and prudence in providing for payment of [its] tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship . . . if [it] paid on the due date." 26 C.F.R. 301.6651-1(c)(1). *See also Staff IT, Inc. v. United States*, 482 F.3d 792, 799 (5th Cir. 2007). The Treasury Regulations further explain "reasonable cause:"

> A failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business care and prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship (as described in § 1.6161–1(b) of this chapter) if he paid on the due date. In determining whether the taxpayer was unable to pay the tax in spite of the exercise of ordinary business care and prudence in providing for payment of his tax liability, consideration will be given to all the facts and circumstances of the taxpayer's financial situation, including the

---

corroborated by Ms. Tucker's deposition testimony. *See In re Family Dollar FLSA Litigation,* 637 F.3d 508, 512 (4th Cir. 2011) (disregarding witness's affidavit and relying on witness's deposition testimony where affidavit was contradictory to prior deposition testimony); *id.* ("But it cannot create a dispute about a fact that is contained in deposition testimony by referring to a subsequent affidavit of the deponent contradicting the deponent's prior testimony, for 'it is well established that a genuine issue of fact is not created where the only issue of fact is to determine which of the two conflicting versions of a party's testimony is correct.'").

[11]    In determining whether "reasonable cause" exists under 26 U.S.C. §§ 6651 (a)(2) and 6656(a), "what elements constitute reasonable cause is a question of law; whether those elements are present is a question of fact." *Conklin Bros. v. United States*, 986 F.2d 315, 317 (9th Cir. 1993) (citing *Boyle*, 469 U.S. at 249 n. 8).

amount and nature of the taxpayer's expenditures in light of the income (or other amounts) he could, at the time of such expenditures, reasonably expect to receive prior to the date prescribed for the payment of the tax. Thus, for example, a taxpayer who incurs lavish or extravagant living expenses in an amount such that the remainder of his assets and anticipated income will be insufficient to pay his tax, has not exercised ordinary business care and prudence in providing for the payment of his tax liability. Further, a taxpayer who invests funds in speculative or illiquid assets has not exercised ordinary business care and prudence in providing for the payment of his tax liability unless, at the time of the investment, the remainder of the taxpayer's assets and estimated income will be sufficient to pay his tax or it can be reasonably foreseen that the speculative or illiquid investment made by the taxpayer can be utilized (by sale or as security for a loan) to realize sufficient funds to satisfy the tax liability. A taxpayer will be considered to have exercised ordinary business care and prudence if he made reasonable efforts to conserve sufficient assets in marketable form to satisfy his tax liability and nevertheless was unable to pay all or a portion of the tax when it became due.

Treas. Reg. § 301.6651-1(c)(1). The regulations also explain that consideration should be give to

the nature of the tax:

In determining if the taxpayer exercised ordinary business care and prudence in providing for the payment of his tax liability, consideration will be given to the nature of the tax which the taxpayer has failed to pay. Thus, for example, facts and circumstances which, because of the taxpayer's efforts to conserve assets in marketable form, may constitute reasonable cause for nonpayment of income taxes may not constitute reasonable cause for failure to pay over taxes described in section 7501[trust fund taxes] that are collected or withheld from any other person.

Treas. Reg. § 301.6651-1(c)(2).

The Treasury Regulations also define "undue hardship:"

The term "undue hardship" means more than an inconvenience to the taxpayer. It must appear that substantial financial loss, for example, loss due to the sale of property at a sacrifice price, will result to the taxpayer for making payment on the due date of the amount with respect to which the extension is desired. If a market exists, the sale of property at the current market price is not ordinarily considered as resulting in an undue hardship.

Treas. Reg. § 1.6161-1(b). "Evidence of financial trouble, without more, is not enough" to establish

undue hardship. *Synergy Staffing, Inc. v. United States,* 323 F.3d 1157, 1160 (9th Cir. 2003).[12]  A

taxpayer seeking a refund of penalties must "come forward with evidence of what funds it did have

on hand each time a payroll tax was due" and "produce evidence of how it spent those funds in lieu

of paying its taxes." *Id.*  Several courts have noted that "financial difficulties as substantial as 'the

potential ruin of a corporation' may constitute reasonable cause." *St. Paul Cathedral School v.

United States*, No. CV-07-3021, 2008 WL 5121928, *6 (E.D. Wash. Dec. 5, 2008) (quoting *Van

Camp*, 251 F.3d at 868).

    The United States argues that, despite financial difficulties, Babcock Center is unable to

demonstrate reasonable cause.[13]  First, the United States maintains that Babcock Center's reduction

---

[12]  The United States urges the court to adopt a bright-light rule adopted by the Sixth Circuit that "financial difficulties can never constitute reasonable cause to excuse the penalties for nonpayment of withholding taxes by an employer." *Brewery, Inc. v. United States*, 33 F.3d 589, 592 (6th Cir. 1994).  The Fourth Circuit has not addressed this issue.  All other Circuits to address this issue have declined to adopt the bright-line rule and instead have adopted a facts-and-circumstances review of the taxpayer's financial hardship.  *See Van Camp & Bennion v. United States*, 251 F.3d 862, 868 (9th Cir. 2001); *East Wind Indus., Inc. v. United States*, 196 F.3d 499, 506, 508 (3d Cir. 1999); *Fran Corp. v. United States*, 164 F.3d 814, 818 (2d Cir. 1999).  For reasons stated in *Fran Corp.*, 164 F.3d at 818, the court considers all facts and circumstances of Babcock Center's financial situation.

[13]  It is clear that Babcock Center had financial difficulties in 2007 and 2008.  Both sides have submitted charts outlining the financial condition of Babcock Center during 2007 and 2008.  The United States' chart shows the balance of Babcock Center's operating account and the general ledger on the payroll dates, and the following date, in which a deposit was not made.  Babcock Center's chart shows the same balances, as well as payroll liability not yet recorded, unrestricted cash balances, outstanding accounts payable, and tax liability due, among others.  The court assumes for purposes of this motion that Babcock Center's chart is accurate.  For many, but not all, of the payroll dates, there was adequate unrestricted cash to pay the payroll taxes.  Babcock Center, however, had outstanding accounts payable on the payroll dates.  If Babcock Center had paid all of its accounts payable, then there would not have been enough money to pay the payroll taxes when due.  Babcock Center has successfully demonstrated financial difficulty during most of 2007 and 2008.  The finding that Babcock Center was experiencing financial difficulty, however, is not alone sufficient to establish undue hardship.

in funding and in size occurred between 2004 and 2006, but the failures to deposit and pay payroll

taxes occurred in 2007 and 2008.  Dkt. No. 46 at 3.[14]  Second, the United States contends that

Babcock Center's payroll procedures resulted in late deposits of payroll taxes.[15]  Third, the United

States argues that Babcock Center management did not prioritize the payment of payroll taxes.  The

United States contends that Babcock Center consistently chose to pay other creditors before the IRS.

The United States maintains that the CFO during 2007 and 2008 testified that when there was choice

between paying the payroll taxes or paying other bills, Babcock Center chose to pay other bills.[16]

---

[14]  *See Francis P. Harvey & Sons, Inc. v. IRS*, 2004 WL 2915309, *15 (D. Mass. 2004) ("There must be temporal proximity between the taxpayer's untimely payments and the pendency of the contract dispute . . . [a]fter the passage of time, the company may no longer be said to be suffering from an acute condition (a short-term financial crisis) but a chronic one (a long-term inability to meet its obligations except by unauthorized borrowing from the Treasury).").

[15]  When it was issuing paper checks, Babcock Center often issued additional payroll checks to correct for errors, such as failure to pay for overtime or include leave time.  Babcock Center would not immediately deposit the tax liability on these additional checks but would add the tax liability to the next payroll deposit, which resulted in penalties.  Mr. Norman testified that Babcock Center's payroll procedures were the reason why some of the taxes "were repeatedly late over a five or six-year period."  Norman Dep. 30:24-25.  In a later affidavit, Mr. Norman avers that "Babcock's payroll procedures concerning supplemental payroll checks did not result in properly assessed penalties."  Norman Aff. ¶ 17.  Mr. Norman states that although the supplemental checks "created discrepancies between Babcock Center records and those of the Internal Revenue Service, the discrepancies were explained and accounted for."  *Id.*

[16]  The current CFO, Mr. Norman, explained what he understood to be the priority of bill payment during 2007 and 2008:

> Q.    So do you know what process that they were using in 2007 and 2008, did anyone tell you, to determine which bills to pay if there were not funds to pay all of them?
> A.    Well, the procedure was then I think the same as when I came in 2009, you know.  You'd have a certain list of priorities, make sure your staff is paid because they're the ones providing the care.  And then directly below that any issues that are directly related to the care and support of those individuals.  Utility bills, food, groceries, transportation, household supplies.  And then below that any structural things that pertain to life, health or safety issues would have been addressed.

*See* Tyler Dep. 33:14-16 ("where it was either pay the bills or pay the taxes[,] we paid the bills.").

For example, the United States highlights a particular creditor, AT&T, and argues that Babcock

Center made arrangements to pay a balance of $65,000 over a three-month period beginning in April

2008. Based on these reasons, the United States argues that Babcock Center has not met its "heavy

burden" of proving that its failures to deposit and pay payroll taxes were due to reasonable cause.

Because of the 50% reduction of funding from SCDDSN in 2004-2006, Babcock Center

contends it suffered cash flow problems in 2007 and 2008 and was unable to deposit and pay its

payroll taxes when due. Babcock Center argues that it acted with ordinary business care and

prudence, but was still unable to meet its tax obligations. Babcock Center maintains that it

exhausted available credit. *See* Tyler Dep. 81: 6-14 ("I think there was a line of credit, if I remember

correctly. I think it might have been maxed."); Norman Dep. 38:3-6 ("But the problem was the

Babcock Center was maxed out on its lines of credit, were [*sic*] getting declined by the bank or

several banks when they applied for credit.").[17] Babcock Center also maintains that it sold off

properties during the relevant time period to raise operating funds, including to pay its payroll

_____

> And then from there we would have looked at things that were essential for the company, our liability coverage for our vehicles, our property insurance for the facilities, employee benefits. And then the vendors would just take a pecking order down below that as the cash was available.
> Q.    And would tax payments sort of fall within the pecking order?
> A.    Mm-hmm.

Norman Dep. 27:10-28:7.

[17]  Ms. Tyler also testified that Babcock Center borrowed $500,000 from the Babcock Foundation at some point prior to June 2007 to help Babcock Center meet its payroll obligations. Tyler Dep. 63:4-64:3. Ms. Tyler explained that the loan was to assist with Babcock Center's payroll obligations, not to assist with the payment of payroll taxes. Tyler Dep. 63:18-19.

taxes.[18]  Babcock Center contends that it was limited in its ability to reduce employees as state regulations mandate a certain employee-to-client ratio.  It also contends that it did not spend extravagantly or invest in speculative assets.  Although Babcock Center acknowledges that it paid some employee bonuses during 2007 and 2008, it maintains that they were *de minimis* ($200 or less) performance bonuses for lower level employees.  Babcock Center contends that it paid the bills necessary to provide adequate care for its disabled clients, such as food, housing, and staff.  Babcock Center argues that telephone service is essential to providing for the health and safety of its disabled clients and it was, therefore, necessary to pay AT&T before the IRS.[19]

_____

[18]  Although there is evidence of the sale of properties, testimony indicates that proceeds from the sale of properties were remitted to SCDDSN, as SCDDSN originally provided the funds to purchase the properties.  *See* Tyler Dep. 111:11-15 ("I can't remember if any of those properties sold while I was there, but if they had sold[,] the money would have gone back to DDSN because DDSN gave them the money to purchase it in the first place."); Dkt. No. 43-2 at 135 (Johnson Dep. 23:18-22) ("The Department – to the best of my recollection, the Department of Disabilities and Special Needs and the Housing Trust Fund, the two entities that purchased those properties, received those funds.").  Babcock Center submitted affidavits that contradict this testimony.  *See* Dkt. No. 57-2 at 3 (Johnson Aff. ¶ 8) ("When these properties were sold, Babcock Center did not return the proceeds of the sales to the State Department of Disabilities and Special Needs, but kept the funds to meet current operating expenses."); Norman Aff. ¶ 8 (same).

[19]  Babcock Center relies on the affidavit and report of Certified Public Accountant Clifton Bodiford to support its contention that "[i]f Babcock Center had paid their [sic] employment taxes when due, it would have had insufficient funds to pay its staff and essential creditors to remain in operation."  Dkt. No. 57 at 7 (citing Bodiford Aff. ¶ 4).  To the extent that Babcock Center attempts to offer Mr. Bodiford as an expert on what creditors were essential to Babcock Center's operations, Mr. Bodiford testified that he did not "look at specifically who was being paid" but rather the total expenses from the income statements.  Dkt. No. 61-1 at 46-47 (Bodiford Dep. 46:17-47:2).  *See also id.* at 52:4-8 ("Q: Did you look specifically at who payments were being paid to in the [general] ledger?  A: No.  I might have seen who some of them were paid to, but I wasn't specifically looking at that.").  Mr. Bodiford testified that he does not purport to be an expert on Babcock Center's operations, nonprofit organizations, or organizations that provide services for the disabled.  *Id.* at 43:17-44.  The court finds that Mr. Bodiford is not qualified to opine on what would have happened to Babcock Center had it timely paid its payroll taxes or which creditors were essential or necessary.

The court, however, does not reject Mr. Bodiford's opinion that Babcock Center "did not

Babcock Center relies on *East Wind Indus., Inc. v. United States*, 196 F.3d 499 (3d Cir. 1999), one of the few cases in which reasonable cause has been found. Dkt. No. 57 at 17-19. In *East Wind*, the taxpayer manufactured military clothing and goods for the United States Department of Defense ("DOD"). 196 F.3d at 501. A variety of other federal agencies administered the contracts for DOD ("Defense Agencies"). *Id.* After 15 years of timely paying payroll taxes, East Wind[20] failed to pay its payroll taxes for six years, 1982-1988. *Id.* East Wind filed a refund suit, arguing that reasonable cause existed for the late payment and deposits of payroll taxes. *Id.* The basis for East Wind's argument was that it was a forced participant in and later victim of a bribery scheme by employees of the Defense Agencies. *Id.* at 501-02.

East Wind explained that employees of the Defense Agencies began soliciting illegal bribes in the late 1970's, which eventually became monetary bribes, amounting to more than 50% of East Wind's business. *Id.* In the beginning, East Wind participated in the bribes but eventually refused to pay the bribes, at which point East Wind did not receive new contracts from the Defense Agencies.[21] *Id.* at 502. When it refused to pay the bribes, the Defense Agencies did not pay East Wind monies owed, payments were intentionally delayed, and inventory was wrongfully rejected. *Id.* East Wind's Vice President, Mario D'Antonio, was eventually contacted by the Federal Bureau

---

have sufficient monies to pay 2007 [and 2008] payroll taxes on a timely basis." Dkt. No. 57-7 at 5 (Bodiford Expert Report for 2007); Dkt. No. 57-7 at 13 (Bodiford Expert Report for 2008). It is undisputed that Babcock Center was experiencing financial difficulty in 2007 and 2008. As stated previously, financial difficulty is not enough to establish the reasonable cause exception to tax penalties.

[20] The taxpayers in this case were affiliated companies, East Wind Industries, Inc. and Delaware East Wind, Inc. For ease, the court simply refers to the taxpayers as East Wind.

[21] East Wind, however, was awarded contracts when it was the only bidder.

of Investigation to cooperate in an investigation of the corrupt employees of the Defense Agencies.

*Id.* D'Antonio went undercover for two years, which included withdrawing East Wind from the competitive bidding process. *Id.* at 502-03. D'Antonio pled guilty to violating the False Claims Act and paid $2000 in fines, avoiding imprisonment. *Id.* at 503. East Wind received $2.1 million from the Defense Agencies as part of a global settlement agreement. *Id.* From this settlement, East Wind paid the outstanding payroll taxes and penalties owed to the IRS. *Id.* As a result of losing the contracts, late payment for contracts completed, and the payment of bribes, East Wind was unable to pay its payroll taxes when due. *Id.*

The Third Circuit found that, upon consideration of the facts and circumstances, East Wind established that payment of the taxes when due would have resulted in undue hardship because there was insufficient cash flow to pay payroll taxes, the reduced work force, and essential creditors. *Id. at 509.* The court noted that East Wind was "at the mercy of the Defense Agencies as to whether [it] would have sufficient cash flow to operate the business." *Id.* at 509-510. Had the Defense Agencies paid East Wind what was owed under the contracts, East Wind would have had sufficient funds to pay its payroll taxes and other debts when due. *Id.* at 511. The Third Circuit also found that East Wind exercised ordinary business care and prudence for the following reasons: (1) all income received by East Wind on government contracts was used to pay either the IRS or employee wages; (2) East Wind "did not pay suppliers, rent, health and welfare premiums, employees' union dues, and workers' compensation insurance premiums;" (3) utility companies were not paid until companies threatened to shut off service; (4) East Wind did not pay any of its suppliers from 1982-96, which was over $7 million owed; (5) D'Antonio secured a mortgage on his personal residence and sold personal assets to obtain cash to pay creditors; (6) East Wind's bookkeeper provided a $65,000 loan

of her personal funds; and (7) D'Antonio sought legal and financial advice as to the bribery scheme and cash flow issues.  *Id.* at 510.  Accordingly, the court found that East Wind was entitled to a refund of penalties.  *Id.* at 512-13.

Babcock Center argues that like *East Wind*, it too was dependent on government funding for adequate cash flow, and that the reduction in government funding caused the cash flow issues.[22] Babcock Center argues, however, that unlike private companies, it was unable to reduce its operations to alleviate its cash flow problem.  Babcock Center cites its mission of providing care for disabled persons.  It contends that it could not reduce the number of employees because of a state-mandated employee-to-client ratio[23] and could not delay the payment of creditors because they were providing essential and necessary services to its disabled clients.

There is some evidence that Babcock Center did not pay creditors on time, creditors threatened to stop providing services or goods to Babcock Center, and Babcock Center negotiated

---

[22]  As of 2007, the first delinquent deposit and payment of payroll taxes at issue in this case, the reduction in services had been completed.  For one reason or another, Babcock Center was unable to operate successfully within its reduced budget.  Unlike *East Wind*, however, Babcock Center was not owed money from the government for services or contracts performed.  It has not argued that it anticipated more funding during 2007-2008, but rather that it had difficulty operating within the new budget.  Babcock Center has not shown an isolated event resulting from an unexpected funding cut, but rather a continuous problem of failing to timely deposit and pay payroll taxes when due, including until the third quarter of 2009.  *See* Dkt. No. 57-11 at 5 (IRS noting that Babcock Center was assessed significant failure to deposit penalties for "eleven of the previous twelve quarters").

[23]  The court observes that Babcock Center's Form 990s indicate that salaries of the executive director (Ms. Johnson) and financial services director (Ms. Tyler) were not reduced between 2006 and 2007.  *See* Dkt. No. 57-19 at 5 (2006: Johnson, $155,249; Tyler, $78,346); Dkt. No. 57-20 (2007: Johnson, $159,678; Tyler, 80,067).  In fact, both employees received a salary increase.  At some point in 2008, Mr. Norman replaced Ms. Tyler.  In 2008, Ms. Johnson's salary was reported as $158,399 and Mr. Norman's was reported as $80,000.  Dkt. No. 57-21 at 7.

18

payment plans with creditors.[24]  *See* Norman Dep. 46:4-24.  There is also some evidence that the

creditors that were paid were essential and necessary to survival of Babcock Center.  *See* Tyler Dep.

33:17-34:2).  The United States contends that Babcock Center preferred other creditors above the

IRS.  Babcock Center acknowledges that it preferred other creditors, but argues that it had to pay

these creditors to provide for its disabled clients.  The United States highlights only one creditor,

AT&T, as being a non-essential creditor.  Babcock Center offers a reasonable explanation as to why

telephone service was essential and necessary.  In light of testimony stating that Babcock Center only

paid essential creditors, and the absence of other challenges to Babcock Center's payment of

creditors, the United States has failed to show the absence of a genuine dispute of material fact.

Whether Babcock Center prioritized other creditors above the IRS and whether the creditors that

were paid were essential and necessary to Babcock Center's survival are factual disputes proper for

jury consideration.

     Based on the evidence submitted, Babcock Center may have difficulty proving which

creditors were paid, which creditors were not, and why the creditors that were paid were essential

and necessary.[25]  However, viewing the evidence in light most favorable to Babcock Center, the court

---

[24]  Babcock Center submitted a report of "aged" accounts payable from August 15, 2008 to
the end of 2008.  Dkt. No. 57-22 at 11-39.  It shows that many bills were paid on time, and some
were past due by 60 or 90 days.  However, this report of a portion of the time period at issue does
not show why certain creditors were paid on time and others were not.  Further, although Babcock
Center repeatedly states that its accounts payable were over $921,000 at the end of 2008, only
$87,652.57 was over 90 days past due.  Dkt. No. 57-22 at 39.

[25]  Babcock Center has submitted, and the court has reviewed, "aged" accounts payable from
August 15, 2008 to end of 2008, check registers for 2007 and the last tax quarter of 2008, general
ledger for 2007-2008, and accounts payable balance for year end for 2007 and 2008.  Despite the
submission of over 1000 pages, Babcock Center failed to summarize or otherwise attempt to show
which creditors were paid and why.  Based on review of these documents, there is evidence that
Babcock Center continued to pay numerous and diverse creditors, including Dish Network, Time

denies summary judgment as to Babcock Center's claims for refunds for penalties paid for the tax

quarters ending March 31, 2007; June 30, 2007; September 30, 2007; December 31, 2007; June 30,

2008; and September 30, 2008.

**II. Reduction of Penalties.** The United States moves for summary judgment on Babcock

Center's claim that the IRS misapplied payments for tax liabilities for 2007, arguing that Babcock

Center has produced no evidence to support that claim.[26]  On March 24, 2009, Babcock Center

mailed three letters to the IRS, along with three checks.  The first letter explained that the enclosed

check in the amount of $86.17 was for interest for the quarter ending March 31, 2007.  The second

letter explained that the enclosed check in the amount of $69,489.20 was for taxes owed for the

quarter ending June 30, 2007.  The letter stated that this "should be directly applied to the amount

due for unpaid taxes."  The third letter explained that the enclosed check in the amount of

$611,981.47 was for taxes owed for the quarter ending September 30, 2007.  Again, the letter stated

that this "should be directly applied to the amount due for unpaid taxes."  The IRS applied the

respective payments to the tax quarters indicated in the letter.  An overpayment of $17,462.03

resulted for the tax quarter ending June 30, 2007, and the IRS applied that overpayment to the tax

period ending September 30, 2007.[27]  The United States argues that, because the letters did not

---

Warner Cable, Dell Marketing, and Trophy and Awards.  Further, it is unclear who will testify as to
the essential and necessary creditors.

[26] Babcock Center seeks an order "requiring Defendant to re-allocate previously designated
payments from the Plaintiff so as to minimize Plaintiff's tax burden" and a "refund of any
overpayment arising out of re-allocation of Plaintiff's payments."  Am. Compl. at 6.

[27] The United States contends that, when the IRS received the $86.17 payment for interest
incurred for the tax quarter ending March 30, 2007, all taxes, penalties, and interest for this tax
quarter had been paid.  It is unclear whether this $86.17 payment was applied to a different tax
period or returned to Babcock Center.

contain instructions on how to apply the overpayments, the IRS had the discretion to apply the payments "as it wishe[d]." Dkt. No. 43-1 at 25.

In response, Babcock Center merely states that the IRS failed to apply the payments as directed by "written instructions," and "did not apply the payments to tax alone as admitted in its brief." Dkt. No. 57 at 28. Without citing any evidence, Babcock Center argues that "[t]here is a genuine issue of fact as to the amounts allegedly due from Babcock Center for 2007 and 2008." *Id.* Babcock Center has not, however, identified a genuine issue of material fact.[28] Even assuming that Babcock Center's March 24, 2009, letters reflect an intent to pay only outstanding tax liabilities and not penalties and/or interest, Babcock Center has failed to demonstrate how the payments were misapplied. In other words, Babcock Center has failed to establish what portion of the payments was applied to tax liability, penalties, and interest. The court, therefore, grants the United States' motion for summary judgment on Babcock Center's claim for reallocation of payments to the IRS.

**III. The United States' Counterclaim.** The United States brought, pursuant to 28 U.S.C. §§ 1340, 1345 and 26 U.S.C. § 7402, a counterclaim to reduce to judgment the amount of the remaining taxes, penalties, and interest due and owing by Babcock Center for the tax quarter ending December 31, 2008. The United States maintains that Babcock Center owes $134,752.12 as of November 12, 2012. Babcock Center's entire response appears below:

---

[28] Babcock Center cites "Disputed Fact ¶ 23," which is a reference to its brief, to identify a factual dispute. Dkt. No. 57 at 28. Paragraph 23 is a one-sentence paragraph that states that the annual tax returns reflect that Babcock Center operated at a loss in 2007 and 2008. *Id.* at 13. The court assumes that the intended citation was to paragraph 25, which states that "[t]he IRS did not apply payments to taxes as instructed thereby wrongfully inflating the alleged amounts due. (Ex. 4, Norman Aff., Para. 18.)" *Id.* Paragraph 18 of Mr. Norman's affidavit, in turn, states that "[t]he IRS did not apply payments to taxes as instructed thereby wrongfully inflating the alleged amounts due." Norman Aff. ¶ 18. This conclusory statement, without explanation, is not enough to create a genuine issue of material fact in light of the evidence cited by the United States.

21

> Because there exists genuine issues of material facts regarding the failure to
> timely pay or deposit due to reasonable cause and not due to willful neglect, and
> because furthermore there remain issues of material fact regarding amounts allegedly
> owing by Babcock Center for the periods ending in 2007 and 2008, the IRS is not
> entitled to judgment as a matter of law.

Dkt. No. 57 at 28. Because Babcock Center cannot prove the absence of willful neglect for the tax

quarter ending December 31, 2008, the court granted summary judgment in favor of the United

States for this tax period. In the absence of any evidence that the amounts assessed by the IRS for

taxes, penalties, and interest are incorrect, the United States' motion for summary judgment as to its

counterclaim is granted. The United States is, therefore, entitled to a judgment in its favor in the

amount of $134,752.12.

### *Motion to Dismiss*

### I. Injunctive Relief.

The United States moved to dismiss Babcock Center's claims for preliminary and permanent

injunctive relief against IRS collection efforts, arguing that the Anti-Injunction Act prohibits such

relief, particularly for tax periods not involved in this action. The Anti-Injunction Act provides,

"[e]xcept as provided in sections 6015(e), 6212(a) and (c), 6213(a), 6225(b), 6246(b), 6330(e)(1),

6331(i), 6672(c), 6694(c), 7426(a) and (b)(1), 7429(b), and 7436, no suit for the purpose of

restraining the assessment or collection of any tax shall be maintained in any court by any person,

whether or not such person is the person against whom such tax was assessed." 26 U.S.C. § 7421(a).

Babcock Center responds that an exception to the Anti-Injunction Act applies, citing 26 U.S.C. §

6330(e)(1), which provides:

> [T]he levy actions which are the subject of the requested hearing and the running of
> any period of limitations under section 6502 (relating to collection after assessment),
> section 6531 (relating to criminal prosecutions), or section 6532 (relating to other
> suits) shall be suspended for the period during which such hearing, and appeals

22

therein, are pending. . . . Notwithstanding the provisions of section 7421(a), the beginning of a levy or proceeding during the time the suspension under this paragraph is in force may be enjoined by a proceeding in the proper court, including the Tax Court.

The United States did not respond to Babcock Center's argument in reply. Based on the failure to address this argument in reply, the court denies the United States' motion to dismiss Babcock Center's claims for injunctive relief.[29]

### II. Tax Quarter Ending December 31, 2007.

The United States also moved to dismiss Babcock Center's claim for refund for the tax quarter ending December 31, 2007, arguing that Babcock Center did not first file a claim for refund with the IRS for this period as is required before bringing suit in district court. Dkt. No. 43-1 at 28 (citing 26 U.S.C. §7422(a)). On April 4, 2010, Babcock Center sent a claim for refund and request for abatement for the tax period January 31, 2007 though September 30, 2007. Dkt. No. 44 at 6 (Form 843). All accompanying documents for the claim for refund (cover letter, and memorandum in support) also specifically list the tax periods as ending March 31, 2007, June 30, 2007, and September 30, 2007. Dkt. No. 44 at 1, 7, 9, 10. Babcock Center argues that, although it did not file a formal claim for refund for the fourth quarter of 2007, Babcock Center referenced the tax quarter ending December 31, 2007 "in its appeal before the Internal Revenue Service Office of Appeals." Dkt. No. 57 at 29 (citing Dkt. No. 57-15 at 1). The cited reference is included in a "Statement of Facts and Law Supporting Request for Abatement of Penalties" dated December 4, 2009, and lists the tax period as "03/2007, 06/2007, 09/2007" at the top of the document. The reference is included

---

[29] Babcock Center also stated that "[t]he IRS should be enjoined from further collection action pending final resolution of this matter." Dkt. No. 57 at 29. Babcock Center, however, has not filed a motion for preliminary injunction requesting such relief.

in the text as follows:

> The government funding can be sporadic and intermittent. In striving to carry out Babcock Center's mission, budgeting and cash management are difficult due to the nature of its funding. Such has been the case over the last few years, including the quarters ending June 30, September 30, and December 31, 2007, resulting in Babcock Center's inability to make timely payment and deposit of its payroll tax liabilities.

Dkt. No. 57-15 at 1. Babcock Center argues that, based on this reference, "the Commissioner was on notice that Babcock Center sought refund and abatement of the penalties and interest pertaining to this quarter." *Id.* at 29. Babcock Center argues that, assuming the omission on Form 843 disqualifies the claim as a formal claim for the period ending December 31, 2007, the claim should be allowed as an informal claim. *Id.* (citing *Newton v. United States*, 163 F. Supp. 614, 619 (Ct. Cl. 1958) (In determining whether an informal claim has been made, "each case must be decided on its own peculiar set of facts with a view towards determining whether under those facts the Commissioner knew, or should have known, that a claim was being made."); *Angelus Milling Co. v. Commissioner*, 325 U.S. 293, 297 (1945) ("[t]he Commissioner's attention should have been focused on the merits of the particular dispute" by the alleged informal claim)). The United States does not address this issue in its reply. Without adequate briefing on whether Babcock Center made an informal claim for the last quarter of 2007, the court denies the United States' motion to dismiss Babcock Center's refund claim for tax quarter ending December 31, 2007.

## CONCLUSION

For reasons stated above, the United States' motion for summary judgment is granted as to Babcock Center's claim for the tax quarter ending December 31, 2008 and as to the United States' counterclaim in the amount of $134,752.12 for taxes, penalties, and interest owed by Babcock Center

for the tax quarter ending December 31, 2008. The United States' motion for summary judgment is also granted as to Babcock Center's claim for reallocation of payments made to the IRS. The United States' motion for summary judgment is denied as to the claims for refunds for tax quarters ending March 31, 2007; June 30, 2007; September 30, 2007; December 31, 2007; June 30, 2008; and September 30, 2008. The United States' motion to dismiss is denied in full.

This case will proceed to jury trial beginning July 24, 2013. Jury selection is May 30, 2013. Other pretrial deadlines may be found in the Third Consent Amended Scheduling Order.

**IT IS SO ORDERED.**


                                                    S/ Cameron McGowan Currie
                                                    CAMERON MCGOWAN CURRIE
                                                    UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
May 2, 2013

25